**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION**

| | | |
|---|---|---|
| **United States,** | : | |
| Plaintiff, | : | Case No.:98-0460-CR |
| ***v.*** | : | |
| **Khalid Shalhoub.** | : | |
| Defendant. | | |

---

**MOTION AND MEMORANDUM OF LAW**
**ON BEHALF OF DEFENDANT KHALID SHALHOUB**
**IN SUPPORT OF HIS MOTION FOR COUNSEL TO**
**SPECIALLY APPEAR TO SEEK A DISMISSAL OF THE INDICTMENT**

Khalid Shalhoub, by and through his counsel, respectfully requests that this Court grant a special appearance by counsel to raise various constitutional and other challenges to the Indictment. First, this case raises an important issue of statutory construction and international law, namely whether the Government can prosecute a case which occurred solely overseas and beyond U.S. jurisdiction, and more importantly, in a venue where the individual's conduct was entirely legal under the law of that foreign jurisdiction. The motion challenges also the Government's right to bring this case to trial after a seventeen year delay.

Second, this motion challenges whether the Government can, consistent with the U.S. Constitution, avoid resolution of all of these issues by labeling Mr. Shalhoub a "fugitive," without any proof whatsoever that the individual has taken any action to flee the jurisdiction. Instead, Mr. Shalhoub has simply done nothing more than decline for seventeen years to travel half-way around the world to defend charges brought by the U.S. Government. If the indictment is not dismissed, the fugitive designation for Mr. Shalhoub should be removed.

## I. PROCEDURAL HISTORY

Khalid Shalhoub was indicted in the Southern District of Florida on June 17, 1998 for one count of parental kidnapping, in violation of 18 U.S.C § 1204, the International Parental

Kidnapping Crime Act ("IPKCA").[1] The indictment alleges that Mr. Shalhoub "with intent to obstruct the lawful exercise of parental rights of [his former wife,] Miriam Hernandez, did remove from the United States a child who had not attained the age of sixteen years and had been living in the United States, and did retain said child outside of the United States in Saudi Arabia."[2]

Simultaneously with issuance of the indictment, the government made an ex parte request to have Mr. Shalhoub held without bond if arrested. Although there was no evidence that Mr. Shalhoub attempted to evade service, or that he was even aware of the charges and fled the jurisdiction of the United States, the Government unilaterally labelled Mr. Shalhoub "a fugitive" on August 13, 1998, and sought a fugitive warrant.[3]

Now, approximately seventeen years after Mr. Shalhoub was indicted in this District, he is still labeled a "fugitive" and will remain so indefinitely unless the Court acts on his motion. No hearing, and certainly none consistent with notions of fundamental due process, has ever been held to determine the propriety of this designation. Nevertheless, Mr. Shalhoub continues to suffer the stigma of being labeled a "fugitive." Labelling Mr. Shalhoub as a fugitive creates a violation of the Due Process Clause. Accordingly, separate and apart from whether the Court grants the motion to dismiss the Indictment, it should remove the designation of Mr. Shalhoub as a fugitive from the court files.

## II. <u>FACTUAL BACKGROUND</u>

Mr. Shalhoub, a Saudi Arabian citizen, and Ms. Hernandez were married in Miami in February 1985. Mr. Shalhoub and Ms. Hernandez had a single child. Following a difficult marriage, Mr. Shalhoub and Ms. Hernandez decided to dissolve the marriage in 1989.

Ms. Hernandez (the same person whose rights allegedly were violated according to the indictment) initiated a court proceeding which was determined to have been fraudulently designed to deprive Mr. Shalhoub of any relationship with the daughter. The Hon. Murray Goldman, presiding over a custody dispute involving Mr. Shalhoub and Ms. Hernandez, in the Circuit Court for the 11th Judicial District issued an order finding that Ms. Hernandez had fraudulently attempted to deprive Mr. Shalhoub of all visitation and other rights by falsely

[1] Exhibit A. Indictment of Khalid Shalhoub, Case no.98-0460, (S.D. Fla. Jul. 17, 1998).
[2] Exhibit A.
[3] Exhibit B. Order placing Defendant on Fugitive Case List, (S.D. Fla. Aug. 14, 1998).

representing that she did not know his whereabouts when she filed petition with the Court seeking a final decree.[4] Judge Goldman urged then State Attorney Janet Reno to consider prosecution of Ms. Hernandez for fraudulently seeking to deprive Mr. Shalhoub of ***his*** parent rights.[5] After Mr. Shalhoub declined to press the matter, no criminal case was brought against Ms. Hernandez.

When Mr. Shalhoub learned of the fraudulent filing, he filed a motion to set aside the Judgment, which was readily granted by the court. The court presiding over the custody dispute found:

> The Final Judgment of Dissolution of Marriage entered October 16, 1989 was procured by the Former Wife by fraud. She filed three separate sworn affidavits with the Court stating in essence that she did not know of her Husband's whereabouts. The statements contained therein were false and constitute a fraud upon the Court.

Ex. C, at 1-2.

The court also dealt with the question of custody and visitation, finding that joint custody was appropriate and that Mr. Shalhoub should have liberal visitation, including the right to travel with his daughter. The court ordered:

> The parties have a minor daughter Yasmeen who has now just turned 5 years old. The Wife has attempted to restrict Husband's visitation with the daughter and his travels with her when he visits Miami. She has asked the Court for supervised visitation and other restrictions upon Husband's access to the daughter and travel. The Court finds that the conduct of the Husband has always been proper as to visitation, keeping the Wife informed of the child's whereabouts when he is with her and having the child telephone her mother when he and the child are together. The Court finds absolutely no basis whatsoever for restricting the Husband's visitation with his daughter.

*Id.* at 4.

After Mr. Shalhoub's daughter visited him in Saudi Arabia, Mr. Shalhoub was indicted on June 17, 1998, and charged with parental kidnapping, in violation of 18 U.S.C. 1204.

---

[4] Exhibit C, Final Order on Motion to Set Aside Judgment and Other Post Judgment Proceedings, May 1, 1991.

[5] Exhibit D, Letter from Hon. Murray Goldman, Circuit Court, Eleventh Judicial Circuit of Florida, to State Attorney, Janet Reno, Jun. 27, 1991.

## ARGUMENT

The Indictment of Mr. Shalhoub is fundamentally flawed. The Indictment is fatally defective in that it fails to allege an offense which is capable of sustaining a conviction. Further, venue does not lie in this District without violating Mr. Shalhoub's constitutional right to be tried in the District where the offense occurred. Further, no such offense can be tried without violating international law and Mr. Shalhoub's right to a speedy trial. In order to avoid considering all of these issues, the Government will likely argue that the Court need not reach these issues because the defendant is a "fugitive" and has no right to raise any of these issues until he surrenders himself in this District. Not only is that label inappropriate here and incorrect as a matter of law, but it violates the Due Process Clause of the Constitution. Unlike any number of proceedings where the Government must comport with due process before tagging an individual with a "label," which ultimately disqualifies that person from certain privileges, immunities or rights, the Government here is seeking to do precisely that, but without a hearing or evidence warranting such treatment.

### I. The Court Should Allow the Special Appearance to Raise Fundamental Constitutional and Other Challenges to the Indictment.

Mr. Shalhoub requests this special appearance to challenge the constitutional and other infirmities in the Indictment. The Government will likely urge this Court to find that, once the Government has unilaterally determined that the defendant is a "fugitive," this Court should bar the door to any arguments challenging the Indictment unless the defendant personally submits to the Court's jurisdiction. The law, however, is to the contrary, and indeed, any use of the "fugitive disentitlement doctrine" here would violate the Due Process Clause. Accordingly, before addressing the constitutional and other challenges to the Indictment itself, we have addressed below why this Court should allow consideration of these issues and reach the merits of this Motion by granting a special appearance by counsel.

#### A. The "Fugitive Disentitlement" Doctrine Is Not Applicable.

Not only is it appropriate for the Court to allow a special appearance here, but it is clear that the "fugitive disentitlement doctrine" used to bar entry to U.S. courts should have no applicability as a matter of law. Accordingly, because the doctrine is inapplicable, Mr. Shalhoub's counsel should be permitted to make a special appearance.

The "fugitive disentitlement doctrine" applies to fugitives from justice, *i.e.* those who "having committed a crime, flees from the jurisdiction of the court where a crime was committed or departs from his usual place of abode and conceals himself within the district." *United States v. Barnette,* 129 F.3d 1179, 1183-84 (11th Cir. 1997) (citing *Empire Blue Cross & Blue Shield v. Finklestein*¸ 111 F.3d 278, 281 (2d Cir. 1997)). *See also Xiang Feng Zhou v. United States AG*, 290 Fed. Appx. 278, 280 (11th Cir. 2008) (quoting from *Magluta v. Samples,* 162 F.3d 662, 664 (11th Cir. 1998) ("The "fugitive disentitlement doctrine limits access to courts by a fugitive who has fled a criminal conviction in a court in the United States.")). Courts have been cautioned against over-extending the doctrine. When evaluating the Supreme Court's decision in *Degen v. United States*, 517 U.S. 820 (1996), the Ninth Circuit, held:

> *Degen* makes clear that fugitive disentitlement is an exceptionally "harsh sanction," to be disfavored whenever its application is not a matter of "necessity." *Id.* at 827. It cautions against the "danger of overreaching," and "counsel[s] restraint in resorting to inherent power."

*Mastro v. Rigby,* 764 F.3d 1090, 1096 (9th Cir. 2014) (internal citations omitted).

In this case, Mr. Shalhoub cannot be considered a "fugitive." Like the defendant in *Hijazi,* Mr. Shalhoub was living abroad, in Saudi Arabia, when he learned of the indictment, and made no effort to flee the jurisdiction. *See In re Hijazi*, 589 F.3d 401, 408 (7th Cir. 2009) (declining to apply the fugitive disentitlement doctrine to a defendant that was lawfully living outside of the United States at the time of his indictment). Mr. Shalhoub should not be treated as a fugitive because he resides and remains in Saudi Arabia. This is particularly true as he made no effort to flee from this jurisdiction.[6]

**B. Even if the "Fugitive Disentitlement Doctrine" Had Any Applicability Here, the Court Should Exercise Its Discretion to Allow the Special Appearance.**

For the reasons expressed below, the "fugitive disentitlement doctrine" could not be applied to Mr. Shalhoub without raising serious constitutional concerns. Nevertheless, the Court need not reach those constitutional issues since this Court has discretion to decline to apply that

---

[6] There is a divergence of views as to whether a defendant can be considered to be a "constructive" fugitive. Compare *In re Hijazi*, 589 F.3d 401, 412-13 (7th Cir. 2009); with *United States v. Catino*, 735 F.2d 718, 722 (2d Cir. 1984); *In re Assets of Martin*, 1 F.3d 1351, 1356-57 (3d Cir. 1993); *United States v. Barnette*, 129 F.3d 1179, 1184 (11th Cir. 1997); *Han Yong Kim v. United States Dist. Court (In re Han Yong Kim)*, 571 Fed. Appx. 556, 557 (9th Cir. 2014).

doctrine and allow a special appearance by counsel to challenge the Indictment. *United States v. Noriega, et.al,* 683 F. Supp. 1373, 1374-75 (S.D. Fla. 1998). Unquestionably, this Court has the authority to decide Mr. Shalhoub's motion based on a special appearance by Mr. Shalhoub's counsel.

Such discretion should be exercised here. In fact, the situation here is similar to that in *In re Hijazi,* 589 F.3d 401, 408 (7th Cir. 2009), where the Court observed that it was well within the district court's authority to render a ruling on defendant's motion to challenge his indictment before trial, and by special appearance. As here, when the defendant was indicted, he was living in a foreign country (Kuwait) with no extradition treaty with the United States. 589 F.3d at 405. And as here, the defendant had done nothing to "flee" the United States upon learning of the indictment. *Id.* While noting that a defendant could not be tried in absentia, the court reasoned:

> Nothing . . . rules out what Hijazi is asking for: that is, a pre-appearance adjudication of the question whether the statutes in question apply extraterritorially to his situation, as well as the question whether his actions were enough to draw him within the personal jurisdiction of the court. In fact, the district court's authority to render such a ruling is well established. It has jurisdiction over all offenses against the laws of the United States, *see* 18 U.S.C. § 3231, and a defendant charged with such an offense is entitled to--indeed, must--file a motion alleging "a defect in instituting the prosecution" or "a defect in the indictment" before trial, *see* FED. R. CRIM. P. 12(b)(3). Thus, even though ordinary proceedings do not provide an adequate alternative, Hijazi is asking for relief well within the power of the district court.

*Id.* at 408. The Seventh Circuit then proceeded to grant the writ of mandamus, and considered the motion to dismiss the indictment, finding that the motion raised "fundamental questions about the legislative reach" of the statute allegedly violated in that case. *Id.* The *Hijazi* court further explained that "there is no doubt that the question of how far a statute reaches out to address conduct undertaken outside the United States, in whole or in part, is a fundamental one." *Id.* Significantly, the defendant in the present case similarly raises such "fundamental questions about the legislative reach" of a federal statute, namely the federal parental kidnapping statute.

Moreover, courts in this jurisdiction have granted motions for special appearance by counsel to contest the validity of an indictment. *United States v. Noriega, et.al,* 683 F. Supp. at 1374-75 (exercising its discretion to allow defendant's counsel to enter a special appearance to present arguments attacking the validity of the indictment and challenging jurisdiction of the court). Also, a Magistrate Judge of this Court has previously granted such an appearance

because a seventeen year delay from the indictment – the same period of time here – presented overriding policy concerns. *United States v. Grajales-Lemos,* 2012 U.S. Dist. Lexis 56742, *6 (S.D. Fla. Mar. 27, 2012). The *Grajales-Lemos* court noted that "[w]here more than seventeen years have elapsed between the defendant's indictment and the present, the constitutional issue raised seems to qualify as an 'overriding policy concern,' at least in this instances and persuades the Court that [defendant's] speedy trial claim should be afforded consideration, despite his fugitive status." *Id.* at *5. Similarly, other cases recognize that it is appropriate to grant a special appearance, particularly where there are serious issues relating to efforts to hale the defendant into court from a foreign jurisdiction. *See United States v. Pub. Warehousing Co. K.S.C.*¸ 2011 U.S. Dist. LEXIS 32658, *11 (N.D. Ga. Mar. 28, 2011) (granting special appearance and declining to apply fugitive disentitlement doctrine to consider defendants' challenge to improper service).

There are additional, compelling reasons beyond the importance of the reach of the federal kidnapping statute, and which provide a sound basis for this Court to exercise its discretion to consider this motion for a special appearance. For one thing, because the Court has no authority to hale a defendant into Court where venue is lacking, the Court has a strong interest in resolving such challenges at the earliest practical stage of the proceedings. Additionally, the constitutional arguments raised in this motion, and the extraordinary passage of time since the indictment, are policy considerations that warrant a review of this motion. *See Grajales-Lemos,* 2012 U.S. Dist. Lexis 56742, at5.

Defendant respectfully requests therefore that the Court exercise its authority to decide the motion on its merits.

## II. APPLICABILITY OF THE FUGITIVE DISENTITLEMENT DOCTRINE HERE WOULD BE UNCONSTITUTIONAL.

Further, Mr. Shalhoub cannot be labelled a fugitive, without any showing that he engaged in any conduct in which he fled the jurisdiction, because the designation implicates fundamental constitutional protections, and violates his right to due process. The government bears the burden of proving by a preponderance of the evidence that Mr. Shalhoub fled from justice with the intent to do so. *United States v. Broe,* 695 F. Supp. 2d 1361, 1370 (S.D. Fla. 2010). Even if the Court does not dismiss the Indictment for the reasons discussed below, it should reject the labeling of Mr. Shalhoub a fugitive. Mr. Shalhoub has lived under the cloud of

the indictment and label as a "fugitive" for over seventeen years, and will continue to do so indefinitely unless this Court reverses the unfounded "fugitive" designation.

### A. Constitutional Due Process Protections Apply to the Labeling of an Individual In Ways That Adversely Impact Them.

It has long been recognized that the mere labeling of an individual with some special designation may have negative connotations, warranting due process considerations. The Supreme Court has recognized a constitutionally-protected interest in "a person's good name, reputation, honor, or integrity." *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S. Ct. 507, 27 L. Ed. 2d 515 (U.S. 1971). The Court has repeatedly held also that labels or badges or other designations of an individual which diminish or disparage that reputation must comply with the Due Process Clause. "[W]here the State attaches 'a badge of infamy' to the citizen, due process comes into play." *Constantineau*, 400 U.S. at 437 (citing *Wieman v. Updegraff*, 344 U.S. 183, 191 (1952)). Accordingly, "[t]he right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." Anti-Fascist Committee v. McGrath, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring).

The Supreme Court has therefore required that due process be met before the government can impose any number of labels, badges or designations on an individual. For instance, the Supreme Court has held that the designation of a prisoner as warranting mental health treatment may trigger due process considerations. *Vitek v. Jones*, 445 U.S. 480, 492 (U.S. 1980) (quoting *Addington v. Texas*, 418 U.S. 425-426 (1979) ("It is indisputable that commitment to a mental hospital 'can engender adverse social consequences to the individual' and that "[whether] we label this phenomena 'stigma' or choose to call it something else . . . we recognize that it can occur and that it can have a very significant impact on the individual."). Due Process Clause is violated when a person is subjected to "a statement [that] causes stigma [and which] is both false and implies that the plaintiff is guilty of serious wrongdoing." *Coleman v. Dretke (Coleman II)*, 409 F.3d 665, 668 (5th Cir. 2005) (*per curiam*) (adopting and expanding upon the reasoning of Coleman I) (citing *Vander Zee v. Reno*, 73 F.3d 1365, 1369 (5th Cir. 1996)). *See also, Toney v. Owens*, 779 F.3d 330, 336 (5th Cir. 2015) (the classification as a sex offender triggered defendant's "liberty interests," and therefore require due process before such a label can be imposed).

Courts asked to determine whether a label or other designation violates due process have developed what is known as "stigma-plus" doctrine. "To prevail on a claim under the stigma-plus doctrine, Plaintiffs must show: (1) public disclosure of a stigmatizing statement by the government, the accuracy of which is contested; plus (2) the denial of some more tangible interest such as employment, or the alteration of a right or status recognized by state law." *Latif v. Holder*, 969 F. Supp. 2d 1293, 1304 (D. Or. 2013) (internal citations omitted).

Here, there is no question that the label of being a "fugitive" creates a stigma sufficient to satisfy the first prong, and carries with it due process concerns. A person who is determined by the government to be a "fugitive" cannot possibly enjoy his or her "good name, reputation, honor, or integrity." *Constantineau,* 400 U.S. at 437. If anything, any ordinary person would conclude that not only is the person guilty of a serious offense, but they have affirmative action to avoid detection, which is consciousness of their guilt.

The second prong is similarly satisfied. In order to satisfy that prong, the party challenging the label or designation needs to show only that he or she was "legally disabled by the listing alone from doing anything they otherwise could do." *Miller v. Cal. Dep't of Soc. Servs.*, 355 F.3d 1172, 1179 (9th Cir. 2004). *See also Latif v. Holder*, 28 F. Supp. 3d 1134, 1150 (D. Or. 2014) (citing *Miller* for the proposition that a "plaintiff can show he has suffered a change of legal status if he 'legally [cannot] do something that [he] could otherwise do.'"); *Barry v. Corrigan*, 2015 U.S. Dist. LEXIS 2516 ( E.D. Mich. Jan. 9, 2015) (granting class certification on the question of whether a statute disqualifying fugitive felons from civil governmental programs was constitutional).

Here, designation of an individual as a "fugitive" has its own set of debilitating consequences. As a preliminary matter, the government may take the position that a party who is designated as a fugitive cannot avail themselves of the court system. Second, impacts of a "fugitive" label are well-illustrated by the decision in *Hijazi*, where the Court took pains to explain the deleterious effects of such a label, and why it was therefore inappropriate to avoid review based on the "fugitive disentitlement doctrine." The court opined:

> As long as the indictment hangs over Hijazi, he is prejudiced even if he does not travel to the United States. He represents in his Supplemental Brief that the United States has directed INTERPOL, the international criminal police organization, to issue a "red notice" regarding Hijazi, which operates as a request to all 188 INTERPOL members to arrest Hijazi if he enters their jurisdiction and, if possible, to extradite him to the United States.

*In re Hijazi*, 589 F.3d at 407. The same is true here. The government has confirmed that the same treatment of Mr. Shalhoub exists, that he is subject to an INTERPOL red notice or "red alert." As a result, he is perceived as a fugitive by all 190 countries participating in INTERPOL, and is unable to travel internationally due to concerns of being detained.

The inability to travel due to the fugitive label places real and meaningful restrictions on an individual's liberty and freedoms. Our courts have held that government imposed restrictions on international travel implicate Constitutional due process liberties. "The right to travel is a part of the liberty of which the citizen cannot be deprived without due process of law under the Fifth Amendment." *Kent v. Dulles*, 357 U.S. 116, 125 (1958). International travel is a liberty interest that is protected by the Due Process Clause of the Fifth Amendment. *DeNieva v. Reyes*, 966 F.2d 480, 485 (9th Cir. 1992) (defendant's protect liberty interest in international travel was infringed by retaining her passport, even though defendant was not completely banned from travelling). "While the Constitution does not ordinarily guarantee the right to travel by any particular form of transportation, given that other forms of travel usually remain possible, the fact remains that for *international* travel, air transport in these modern times is practically the only form of transportation." *Ibrahim v. Department of Homeland Security*, 2012 U.S. Dist. LEXIS 180433, *22 (N.D. Cal. Dec. 20, 2012) (emphasis in original) (holding that the government violated a liberty interest when it inadvertently nominated Ibrahim, a foreign national living in the United States, to the No-Fly List and caused her name to appear in numerous government databases for suspicion of terrorism). *See also, Latif v. Holder*, 28 F. Supp. 3d at 1149 (recognizing that constitutionally-protected liberty interests in travelling internationally by airplane are significantly affected by being placed on the No-Fly List). Accordingly, government restrictions placed upon an individual's rights to international travel implicates Due Process under the Fifth Amendment. Here, the government's act of designating Mr. Shalhoub as a fugitive, much like placing a person on the No-Fly List, constitutes prejudice to an individual.

**B. Mr. Shalhoub Is Not, and Never Has Been, a Fugitive.**

The government will no doubt argue that a hearing would be a meaningless task since Mr. Shalhoub failed to appear for arraignment, and is therefore a "fugitive." Fundamentally, the notion that a defendant can be treated as a fugitive if he simply fails to appear for arraignment runs counter to authority from the Supreme Court and the Eleventh Circuit, holding that "[a] defendant has no duty to bring himself to trial; the [Government] has that duty . .. .'" *United*

*States v. Ingram*, 446 F.3d 1332, 1337 (11th Cir. 2006) (quoting from *Barker v. Wingo*, 407 U.S. 514, 527 (1972)). Those holdings are reduced to a nullity if a defendant can be determined in absentia to be a fugitive if all he has done is failed to appear for arraignment.

Moreover, any contrary position is based on a misconception as to what constitutes a "fugitive," The notion that a fugitive must actually "flee" the jurisdiction is consistent with the Constitution, federal statutes and common usage of the term. Significantly, in spelling out the authority of the Executive Branch to extradite an individual, the Constitution provides in Article IV, Section 2, Clause 2, that a person charged with a crime "who shall flee from Justice, and be found in another State, shall on Demand of the Executive Authority of the State ***from which he fled***, be delivered up, to be removed to the State having Jurisdiction of the Crime." U.S. Const. Art. IV, Section 2, Clause 2 (emphasis added). Similarly, case law construing the federal Extradition Act, 18 U.S.C.§§ 3181-3195, which contains the term "fugitive from justice," again emphasize that a defendant must flee to be a fugitive. Courts have defined that term as a person legally charged with commission of crime in demanding state and who has fled that state to avoid arrest. For instance the Fifth Circuit has held:

> The statute which implements the constitutional provision, Title 18, § 3182, U.S.C. (1948) is to the effect that whenever the executive authority of any state demands any person, as a fugitive from justice, of the executive authority of any state ***to which such person has fled***, and produces properly authenticated documents charging the person demanded with having committed a crime, it shall be the duty of the executive authority of the state to which such person has fled to cause him to be arrested and to cause him to be delivered to the agent of the demanding state.

*Miller v. Decker*, 411 F.2d 302, 303 (5th Cir. 1969) (emphasis added).

Numerous cases define the term "fugitive from justice" as requiring some affirmative act to flee a jurisdiction, or to leave the jurisdiction with the intent of avoiding prosecution. *Ex parte Ayers*, 90 Okla Crim 255, 213 P.2d 297 (1949); *Ex parte Foster*, 60 Okla Crim 50, 61 P.2d 37 (1936); *Ex parte Williams*, 71 SD 95, 21 NW2d 593 (1946); *Ex parte Montoya*, 170 Or 499, 135 P.2d 281l (1943); *Johnson v Peterson*, 1 Wash App 856, 466 P.2d 183 (1970).

And finally, commonly used sources define the term "fugitive" as "running away to avoid being captured." See Merriam Webster's Online Dictionary, *available at* http://www.merriam-webster.com/dictionary/fugitive.

Mr. Shalhoub has been designated a fugitive without any determination that he intended to, or did, flee, but has been designated worldwide as a "fugitive," resulting in issuance of a "red notice." Further, based solely on the Government's ex parte application, that label was placed on him without any regard for Mr. Shalhoub's due process rights. At the very least, there should be some showing as to what actions Mr. Shalhoub undertook to flee the jurisdiction before he is designated as a fugitive.

## III. THE INDICTMENT SHOULD BE DISMISSED.

The Indictment here is seriously flawed, and based on the erroneous premise that an individual living overseas and abiding by all the laws of his home country with respect to the conduct in question, can nevertheless be prosecuted. As explained below, no offense can be proven at trial, and further, even if a crime could conceivably be argued to have been committed, no venue exists here. And finally, further prosecution of Mr. Shalhoub is barred by the Sixth Amendment, which guarantees a right to a speedy trial. The seventeen year delay here is anything but "speedy."

### A. The Indictment Fails to Allege An Offense Which Can be Proven At Trial.

The government issued a single sentence Indictment against Mr. Shalhoub that tracked the language of the statute without any details specific to the alleged offense. If the court had before it nothing more than the Indictment, it is plain that the bare bones allegations here would fail the test set forth in FED.R.CR.P. 7, which requires a statement of the "essential facts" supporting the charges. Here, virtually no facts – essential or otherwise – are stated in the Indictment.

Pursuant to Fed. R. Cr. P. 12(b)(2), Mr. Shalhoub has the right to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue[.]" Similarly, "Rule 12(b)(3)(B) permits a court "at any time while the case is pending . . . [to] hear a claim that the indictment or information fails to . . . state an offense." The Rule therefore serves the legitimate needs of judicial efficiency, as well as those of the parties, by refusing to insist that cases proceed to trial where there is no reasonable basis for a conviction.

It is no answer to say that because the indictment mimics the language of the statute, that is sufficient to cut off any inquiry under Rule 12(b)(3)(B). If that were the case, there would have been no reason to even adopt the rule, instead of a simple sentence that every indictment

must track the language of the statute alleged to have been violated. Moreover, the Supreme Court has noted that "while an indictment parroting the language of a federal criminal statue is often sufficient, there are crimes that must be charged with greater specificity." *United States v. Resendiz-Ponce*, 549 U.S. 102, 109, 127 S. Ct. 782, 789, 166 L. Ed. 2d 591 (2007).

An indictment can, and should, be reviewed to determine whether it can support the charges even where the indictment mimics the language of the statute allegedly violated. The Supreme Court made clear that dismissal is particularly appropriate in a case such as the present one, where there are undisputed facts showing that there is a legally sufficient defense to the merits, and all that is at issue is the construction of the statute. *United States v. Covington*, 395 U.S. 57 (1969) (The Supreme Court found that the lower court properly acted to resolve the propriety of the indictment on a motion prior to trial where the decision could be "'based upon the . . . construction of the statute upon which the indictment . . . [was] founded.'")(internal citations omitted) Such an "approach avoids the waste of judicial resources that results from 'legally meritless cases being sent to trial." *United States v. Flores*, 404 F.3d 320, 326 (5th Cir. 2005).[7]

Further, a court ruling on a motion pursuant to FED.R.CR.P. 12(b)(2) need not confine itself to the four corners of an indictment, but may consider extrinsic material which is properly placed before it, such as through judicial notice. For instance, in *United States v. Levin*, the

[7] There appears to be a difference of opinion among the Circuits as to when a district court may dismiss an indictment which tracks the four-corners of a statute. Two Circuits, the Fifth and the Sixth, hold that a court may do so whenever the issue may be decided without resolving a factual dispute. *See United States v. Levin*, 973 F.2d 463 (6th Cir. 1992); *United States v. Flores, supra*. Other circuits have refused to find that Rule 12(b) is properly utilized to test an indictment when doing so would essentially require the court to test the "sufficiency of the evidence." *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996); *United States v. DeLaurentis*, 230 F.3d 659, 661 (3d Cir. 2000). The Eleventh Circuit has grappled with the issue and seemingly offers divergent views. Compare *United States v. Salman*, 378 F.3d 1266, 1268 (11th Cir. Fla. 2004) (refusing to allow a procedure that would be analogous to summary judgment in civil cases); with *United States v. Zayas-Morales*, 685 F.2d 1272, 1274 (11th Cir. Fla. 1982)(noting that "[a]ll parties agreed the District Court possessed the ability to rule on the motions "without invading the province of the ultimate finder of fact," and that "all agreed that a single issue was presented: whether, as a matter of law, the defendants' acts were criminally proscribed by [the statute].").

The instant motion, however, does not require resolution of that issue, as the defendant is not challenging the sufficiency of the evidence, but rather seeks dismissal based on a question of statutory construction that would be dispositive. No court has held that an indictment which cannot sustain an offense needs to be mindlessly brought to trial where a conviction is unattainable as a matter of law.

Sixth Circuit affirmed the dismissal of an indictment based on extrinsic evidence which demonstrated that the defendant could not have formed the necessary criminal intent to commit the crime. 973 F.2d 463, 469 (6th Cir. 1992). Referring to governmental letters that refuted a finding of criminal intent, the court in *Levin* rejected arguments by the defense that a district court lacked authority to consider such outside material on a motion to dismiss. The majority found that any contrary conclusion ignores the language of Rule 12(b), and other support for such an approach. *Id.* (citing *United States v. Covington*, 395 U.S. at 1561; 8 JEREMY C. MOORE, et al., MOORE'S FEDERAL PRACTICE P 12.04 1, at 12-42, 43 (2d ed. 1976)). *See also United States v. Ali*, 557 F.3d 715, 719 (6th Cir. 2009) (allowing extrinsic evidence in ruling on a motion to dismiss).

Here, any rational view of the Indictment demonstrates that no offense could have occurred pursuant to the parental kidnapping statute. For one thing, the statute explicitly states that the offense occurred overseas when Mr. Shalhoub failed to return his daughter to the United States. But Mr. Shalhoub was acting lawfully in Saudi Arabia. Mr. Shalhoub's exercise of custody of his daughter in Saudi Arabia was legal under the laws of that nation and expected by the customs of the land. As the U.S. Department of State has explained:

> "In Saudi Arabia, child custody is based on Islamic law…Normally, under Shari'a law, a mother can maintain custody of her…female children until age seven. Even when a mother who is residing in Saudi Arabia is granted physical custody of children, the father maintains legal custody and has the right to determine where the children live and travel."[8]

It is undisputed that Mr. Shalhoub's daughter was over the age of seven years when the facts alleged in the Indictment occurred.

The sole issue then is whether Congress intended to supplant foreign law governing custody where the child is located, with the law of any state where parental custody rights were determined, or indeed, could possibly have been determined. Application of uniformly accepted principles of statutory interpretation foreclose any such argument.

As explained also in connection with arguments directed to international law, there must be some clear intention on the part of Congress to apply U.S. law overseas before a court will reach that conclusion. Indeed, cases are legion reaching the conclusion that statutes are

[8] Exhibit E, http://travel.state.gove/abduction/country/country_517.html (last visited August 30, 2012). The Court can take judicial notice of foreign law in this case, which presumably is not disputed.

presumed *not* to have extraterritorial effect. *See, e.g., Kiobel v. Royal Dutch Petro. Co.*, 133 S. Ct. 1659, 1664 (U.S. 2013) ("'[w]hen a statute gives no clear indication of an extraterritorial application, it has none,'" (quoting *Morrison v. National Australia Bank Ltd.*, 561 U.S. 561 U.S. 247, 248 (2010) 130 S. Ct. 2869, 2878, 177 L. Ed. 2d 535 (2010*))*. *See also Small v. United States*, 544 U.S. 385, 125 S. Ct. 1752, 161 L. Ed. 2d 651 (2005); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 113 S. Ct. 2549, 125 L. Ed. 2d 128 (1993); *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 111 S. Ct. 1227, 113 L. Ed. 2d 274 (1991); *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 77 S. Ct. 699, 1 L. Ed. 2d 709 (1957).

Here, there is no indication that Congress intended to supplant the law in Saudi Arabia with U.S. law. For one thing, the statute itself is completely silent as to any such intention to construe the phrase "by operation of law" in the statute only to apply to U.S. law. That alone should be sufficient to conclude that U.S. law should not be exported around the world. *See, e.g., Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454, 127 S. Ct. 1746, 167 L. Ed. 2d 737 (2007) (concluding that the presumption against extraterritorial application reflects the "presumption that United States law governs domestically but does not rule the world.")[9]

Nor is it convincing to argue that the offense occurred in this District when Mr. Shalhoub allegedly "removed" his daughter, for a visit to Saudi Arabia. If that were the theory of the Indictment it would run afoul of the statutory provision making clear that it is an affirmative defense that the child was removed pursuant to a lawful court order relating to custody. *See* 18 U.S.C. 1402(c) ("It shall be an affirmative defense under this section that— **(**1**)** the defendant acted within the provisions of a valid court order granting the defendant legal custody or visitation rights . . . .").

Here, the custody order gives Mr. Shalhoub the right to remove his daughter from the United States. The custody order provides that Mr. Shalhoub had the court-ordered right to travel with his daughter, including to Saudi Arabia.[10]

---

[9] Moreover, the statute actually leads to the conclusion that foreign law can and should be considered based on the location of events giving rise to a possible violation. Instead of providing that only U.S. law should be considered, the statute provides that nothing in the Act should be construed to violate the Hague Convention. Even though Saudi Arabia is not a signatory to that convention, the reference clearly shows an intention not to limit the statute to local U.S. law.

[10] Exhibit C. The custody order provided:

Because Congress never intended to supplant the law of Saudi Arabia with the law of the State of Florida, Mr. Shalhoub's conduct can be deemed unlawful only if he violated the law where the offense allegedly was committed. Because it is clear that no such violation occurred within the United States, the Indictment should be dismissed.

**1. Venue is Lacking in this District.**

Venue generally is required by the Constitution, statute, and the Federal Rules of Criminal Procedure. The Constitution in Article III provides that "the Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3. The requirement of proper venue is reaffirmed in the Sixth Amendment to the Constitution, which similarly provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const., Amend VI. And the Federal Rules of Criminal Procedure reinforce this requirement by providing that "the [G]overnment must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18

As explained below, because all of the essential elements of alleged crime of kidnapping occurred in Saudi Arabia, no venue exists to prosecute this case in the Southern District of Florida. The decision in *United States v. Clenney*, 434 F.3d 780, 781 (5th Cir. 2005), is squarely on point. In *Clenney*, defendant resided in the Southern District of Texas, and took his son from where he and his mother were living, in the Northern District of Texas, and then traveled to Belize. The court held that venue was improper in the Northern District of Texas. The court held:

> The government argues that venue exists under the terms of the statute because "the intent to obstruct the lawful exercise of parental rights" is an element of the offense, and [the child's mother] Carmichael's parental rights were violated in the

---

> The Former Husband is free to travel with the child without any restrictions thereon except that he shall in advance of any such trip provide the Former Wife with his and the child's itinerary, the places they will be staying and phone numbers of such places. Additionally, during such travel he shall continue to make sure that the daughter calls her mother on a regular basis so that they remain in contact with each other. Although the Court does not restrict where the Former Husband may travel, it recommends that due to the child's age he not take her out of the United States for another year or two. However, any such request in that regard will be considered if appropriate.

There is no dispute that it was more than two years after the Order was entered when his daughter travelled to Saudi Arabia.

> Northern District. We disagree, because this element merely speaks to the offender's *mens rea* as he commits the conduct essential to the crime; it is plainly not an "essential conduct element" as required by *Rodriguez-Moreno*. Moreover, even if the intent to obstruct parental rights were an essential conduct element of this crime, that intent was formed and existed solely in the mind of Clenney, who never set foot in the Northern District; the intent element is a mental state that cannot have been "committed" anywhere but where he was physically present.

*Id.* at 781-782 (footnote omitted).

The Court in C*lenney* similarly rejected the government's assertion that venue was proper in the Northern District because the child, Jacob, was a resident of that district and "was retained outside that district . . .," finding the Government's claim to be "without merit." *Id.* at 782. *See also United States v. Miller*, 2012 U.S. Dist. LEXIS 57834 (D. Vt. Apr. 25, 2012) (following *Clenney* and holding that "[t]here is only one essential conduct element of this offense: removing a child from the United States. . .," and that "[w]hatever additional state or federal laws [the defendant] may have violated, she did not violate 18 U.S.C. § 1204(a) until she allegedly acted to remove IMJ from the United States.").

Accordingly, there is no basis for holding that venue exists in this District. Because the only thing that happened in this District is that Mr. Shalhoub's daughter left for a court-authorized visit to Saudi Arabia, no venue could properly lie in this District.

### 2. Application of the Statute to Reach Conduct in Saudi Arabia Would Violate International Law, and Was Not Intended by Congress.

International comity principles caution courts to avoid unreasonable interference with the sovereign authority of other nations. *F. Hoffman-La Roche Ltd v. Empagran S.A.*, 542 U.S. 155, 164 (2004). Punishing a crime committed on foreign soil is an intrusion into the sovereign territory of another nation. *United States v. Caicedo*, 47 F.3d 370, 372 (9th Cir. 1995) ("As a matter of comity and fairness, such an intrusion should not be undertaken absent proof that there is a connection between the criminal conduct and the United States sufficient to justify the United States' pursuit of its interests.") Indeed, as discussed above, this interest in encouraging comity between nations is exactly why courts are loathe to construe a statute as applying extraterritorially absent a clear indication by Congress that it intended to do so. This presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *EEOC v. Arabian American Oil Co.*, 499

U.S. 244, 248, 111 S. Ct. 1227, 113 L. Ed. 2d 274 (1991) (Aramco). As the Supreme Court has explained:

> "For us to run interference in . . . a delicate field of international relations there must be present the affirmative intention of the Congress clearly expressed. It alone has the facilities necessary to make fairly such an important policy decision where the possibilities of international discord are so evident and retaliative action so certain." . . . The presumption against extraterritorial application helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches.

*Kiobel v. Royal Dutch Petro. Co.*, 133 S. Ct. 1659, 1664 (U.S. 2013) (quoting from *Benz v. Compania Naviera Hidalgo, S. A.*, 353 U.S. 138, 147, 77 S. Ct. 699, 1 L. Ed. 2d 709 (1957).

International law, as well the law of the United States, provides limitations on the United States' power to regulate conduct occurring outside of its territory. *See* Restatement (Third) of Foreign Relations Law ("Restatement"). As the Supreme Court has explained the "rule of statutory construction cautions courts to assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws." *Empagran* S.A., 542 U.S. at 164. When the proposed extraterritorial application of a statute would conflict with international law, a court's duty is to construe the statute not to such an application. *United States v. Dawn*, 129 F.3d 878, 882 (7th Cir. 1997) (criminal laws may apply "extraterritorially only to the extent that extraterritorial application is consistent with principles of international law"). Statutes should not be interpreted to regulate foreign persons or conduct if that regulation would conflict with international law. *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 815 (1993).

Consequently, any extension of the statute to bar conduct that is completely lawful in Saudi Arabia would run afoul of international law.

**B. The Prosecution Here Violates Mr. Shalhoub's Sixth Amendment Right to a Speedy Trial.**

Mr. Shalhoub further challenges the indictment for violation of Sixth Amendment right to speedy trial. This Court has granted a motion for special appearance in similar circumstances when there was a seventeen year delay between indictment and the motion. *Grajales-Lemos,* 2012 U.S. Dist. Lexis 56742, *6 (granting appearance, despite alleged "fugitive" status, because 17 year delay presents overriding policy considerations). While the Government will respond that it was incapable of bringing this case to trial while Mr. Shalhoub was in Saudi Arabia, there

is an overriding public policy interest in bringing stale cases to a conclusion, including by dismissal if necessary.

In determining whether the right to a speedy trial was violated, a court should consider: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). A delay of one year is considered "presumptively prejudicial," and triggers an inquiry into the other *Barker* factors. *Doggett v. United States*, 505 U.S. 647, 652 n.1, 112 S. Ct. 2686, 2691 n.1, 120 L. Ed. 2d 520 (1992) (facing an eight year delay in trial). The Supreme Court explained that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify," and its importance increase as the length of the delay increases." *Id.* at 655-56. The second factor, the reason for the delay, may be attributable to the Government, as it– not the defendant – bears the burden of ensuring when it brought this case that it could bring the defendant to trial. *United States v. Ingram*, 446 F.3d 1332 (11th Cir. 2006) (Because the prosecutor and the court have an affirmative constitutional obligation to try the defendant in a timely manner . . . the burden is on the prosecution to explain the cause of the pre-trial delay.) (internal citations omitted).

The third factor is whether the defendant requested a speedy trial. Mr. Shalhoub has not previously asserted his right, but the overwhelming delay and prejudice faced by the delay weigh in favor of a speedy trial violation. The fourth element to be balanced is the prejudice to the accused that resulted from the delay. *Barker*, 407 U.S. at 533. Affirmative proof of particularized prejudice is not essential to every speedy trial claim. *Stoner v. Graddick*, 751 F.2d 1535, 1544 (11th Cir. 1985); *see also Doggett*, 505 U.S. at 655.

Here, unless the prosecution admits that no offense occurred in this District, it is critical to his defense that all facts relating to (1) the custody dispute, (2) the circumstances surrounding the trip by Mr. Shalhoub's daughter to Saudi Arabia, and (3) events in Saudi Arabia, be made available to the defense. Counsel for Mr. Shalhoub has attempted to obtain the file from former counsel for Mr. Shalhoub in the custody action and been informed that the file long ago ceased to exist, and witnesses are no longer available now (seventeen years later), as to critical events.

Other witnesses with knowledge of relevant facts in Saudi Arabia have advised that they no longer have recall of key events.[11]

## IV. <u>CONCLUSION</u>

For the forgoing reasons, Mr. Shalhoub respectfully requests that this Court grant the special appearance by counsel, and should dismiss the Indictment under Rules 7 and 12(b) of the Federal Rules of Criminal Procedure, and because the Indictment conflicts with international law, and violates the speedy trial rights of the defendant. In the alternative, Mr. Shalhoub requests that his designation as a fugitive be dismissed.

## <u>LOCAL RULE 88.9 CERTIFICATION</u>

I HEREBY CERTIFY, pursuant to Local Rule 88.9(a), that counsel have conferred in a good faith effort to resolve the issues raised in Defendant's motion titled Motion And Memorandum Of Law On Behalf Of Defendant Khalid Shalhoub In Support of His Motion For Counsel to Specially Appear to Seek a Dismissal of the Indictment, and have been unable to do so. Defense counsel has met with the United States Attorney's Office to discuss these issues and potential resolutions on at least three separate occasions. Within the past several years, attorneys for the Defendant have met personally to discuss Mr. Shalhoub's case with Assistant United States Attorneys Brooke Watson, Peter Forand, Alexandra Hui, and Rosa Rodriguez.

On September 28, 2015, I emailed Assistant United States Attorney Watson advising her of the intent to file the Motion to Dismiss the Indictment, as well as the Pro Hac Vice Motion for Mr. Rosenthal's special appearance. I outlined in my email the grounds in support of the Motion to Dismiss the Indictment and asked if the Government would agree to the Motion. On September 29, 2015, Ms. Watson replied by email that the Government opposed the Motion to Dismiss the Indictment.

---

[11] Counsel for Mr. Shalhoub requests that they be given an opportunity to make an *ex parte* showing on this issue.

Dated: November 16, 2015

Respectfully submitted,

*/s/ Rebekah J. Poston*____________
Rebekah J. Poston
Florida Bar No. 183355
**SQUIRE PATTON BOGGS (US) LLP**
200 South Biscayne Boulevard
47th Floor
Miami, FL 33131
(305) 577-7022 Direct
(305) 577-7000 Main#
(305) 577-7001 Fax
Email: rebekah.poston@squirepb.com

Samuel Rosenthal
(Admitted *pro hac vice*)
**SQUIRE PATTON BOGGS (US) LLP**
2550 M. Street, NW
Washington, DC 20037
(202) 457-6321 Direct
(202) 351-0593 Fax
Email: samuel.rosenthal@squirepb.com

***Counsel for Defendant Khalid Shalhoub***

Of counsel:

Brian Vohrer
Lesley Sachs
Thomas Zeno

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **Motion And Memorandum Of Law On Behalf Of Defendant Khalid Shalhoub In Support Of His Motion For Counsel To Specially Appear To Seek A Dismissal Of The Indictment** was served by ECF on November 16, 2015, on all counsel or parties of record on the service list.

__*/s/ Rebekah J. Poston*____
Rebekah J. Poston